**Ahmed SHEPPARD, et al., Plaintiffs,**

**v.**

**Andrew PHOENIX, et al., Defendants.**

**No. 91 Civ. 4148(RPP).**

United States District Court,
S.D. New York.

July 16, 2002.

Ahmed G. Sheppard, Elmira, NY, pro se.

Jonathan S. Chasan, legal Aid Society, Philip Weinste, New york City, for Ahmed G. Sheppard.

Jonathan S. Chasin, Legal Aid Society, New York City, for John Scott, Richard Huarotte, Carl Brown, Sherwin Charles, Maurice Louree, Eugene Harris, Alex Virella, Hassan M. Scott, Barron Cunningham, Christopher Flowers, Paul Quartieri, Greg Miles, Eric Sanchez, Michael Streeter.

Dale Allen Wilker, Legal Aid Society, New York City, for plaintiffs.

Bonnie Goldsmith, O. Peter Sherwood, Corp. Counsel of City of New York, New York City, Eileen Helen Persky, Law Office of Lawrence N. Rogak, Oceanside, NY, for Andrew Phoenix, James Bird, William Kozack, Jose Viera, Gerald Mitchell, Marron Hopkins, Allyn Sielaff, Catherine Abate, City of New York.

Martha Anne Calhoun, Corporate Counsel of City of New York, New York City, for Olivieri, Cosolito, Kettterer, Davenport, Peele, Spissinger, Washington and Whitfield, Officer Matos.

Eileen Helen Persky Law Office of Lawrence N. Rogak, Oceanside, NY, for Offi-

cer Coxson, Officer Gumsudere, Officer Rosado, Officer Rose, Officer Cesario, Officer Coard, officer Herrera, Officer Arusano, Officer Capurro, Jose Viera, Gerald Mitchell, Officer Russell, Officer Davis, Officer Rohr, Officer Froehlich, Officer Hatcher, Officer Scaramuzzo, Officer Henry, John Does 1-50, Captain Martinez.

Pamela H. Schwager, Tellerman, Paticoff & Greenberg, New York City, for Officer Russell.

## OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.

On May 7, 2002, plaintiffs' counsel agreed that the Stipulation herein constituting a consent decree be terminated by the Court and the action be dismissed. This opinion and order is being issued because of the Court's conclusion that a record should be made of the manner in which the parties to this action, and particularly their counsel, cooperated to negotiate a detailed consent decree, and, then, to implement the terms of that decree with the result that an institutional change benefitting both parties was effected in the Central Punitive Segregation Unit (the "CPSU"), of the Department of Correction ("DOC") at Rikers Island.[1]

Steve J. Martin, an expert on penal institutions with many years of experience in the State of Texas correctional system, described the use of force on inmates housed in the CPSU in late 1996:

[T]he sheer number of serious incidents (multiple and serious injuries to inmates) that are disproportionate to the threat of harm to staff (because the inmates are either unarmed, restrained

or locked securely in a cell) is un-precedented in my experience ... Multiple head injuries sustained by inmates in routine applications of force in the CPSU [are] so commonplace as to constitute a clear pattern and practice of employing techniques intended to harm rather than restrain and control inmates ... The evidence of a pattern of excessive and unnecessary force in the CPSU from 1988 to 1996 represents the most uniform and prodigious body of evidence, from the highest levels of the Department to the line level staff in the CPSU, I've encountered in my career.

(Plaintiffs' Report to the Court on the Stipulation of Settlement dated March 21, 2002, p. 2.)

### *Background*

Over ten years ago, Ahmed Sheppard filed a pro se complaint against Andrew Phoenix, Warden of the James A. Thomas Center at the Rikers Island Correctional Facility of the City of New York, charging that on July 30, 1990, while he was an inmate in the CPSU, correction officers had beaten him unconscious. In February 1993, the Prisoners' Rights Project of the Legal Aid Society by Jonathan S. Chasan, Esq., filed a notice of appearance in the action on behalf of Mr. Sheppard, as well as a stipulated order permitting amendment of the complaint and additional plaintiffs to be joined. An Amended Complaint was filed, naming additional plaintiffs and individual correction officers as defendants. By stipulation and order signed by Judge Leval, a class action was certified on behalf of fifteen inmates of the CPSU, charging a pattern of brutality and the use of gratuitous and excessive physical violence by correction officers and supervisory personnel.[2]

---

1. The Central Punitive Segregation Unit is comprised of those prisoners whom the DOC has found to be major disciplinary problems and most difficult to handle.

2. Upon Judge Leval's being sworn in as a Judge of the Second Circuit in December 1993, the case was reassigned to this Judge.

In March 1996, the City of New York moved the CPSU to a much newer facility, the Otis Bantum Correctional Center, installed 337 wall mounted video cameras, and made other renovations. In 1996, the City declined to represent and to indemnify many of the named individual correction officers and supervisory personnel. In April 1996, the City of New York and each of the named plaintiffs agreed to monetary amounts in full settlement of all claims for damages, and plaintiffs' counsel waived any claims for attorneys fees and costs. There then followed fact discovery relating to the nature of injunctive relief to be sought from the Court on behalf of members of the class. That discovery was referred to Magistrate Judge Michael H. Dolinger.

On January 6, 1998, trial was set for May 4, 1998. On March 16, 1998, the City reported that settlement negotiations were progressing and requested an extension of time to file the pretrial order in view of the settlement negotiations relating to the notice of the equitable relief sought. Thereafter, several pretrial conferences were held in April, May and June 1998, as a result of which plaintiffs' counsel caused notices of the terms of settlement to be served on, and discussed with, each inmate of the CPSU. On July 10, 1998, a Stipulation and Order of Settlement (the "Stipulation") was signed. On July 16, 1998, motions to intervene by the Correction Officers Benevolent Association and Correction Captains Association were denied.

*The Structure of the Stipulation*

Under the terms of the Stipulation, joint expert consultants, Norman A. Carlson, former director for 17 years of the United States Bureau of Prisons, and Steve J. Martin, were appointed to assist the DOC in formulating written standards and procedures governing the use of force, nature of training and operations manuals, and to conduct site visits to assess compliance with the Stipulation.

The Stipulation, drawn by counsel for both plaintiffs and the City, was structured such that the role of the experts as consultants to the DOC was as important as their role as monitors of compliance. Thus, both the DOC and the consultants were able to assess what policies and procedures furthered the goals of the Stipulation, not merely to assess what was required by each of its paragraphs. The Stipulation was drawn to comply with 18 U.S.C. § 362(a) and required the DOC to develop a *use of force policy*, under which CPSU staff were to be directed and trained to respond to inmate misconduct without force or, if force was necessary, to utilize control techniques, including force and chemical agents, in ways that minimize injuries to both inmates and staff.

As described by the City's letter to the Court dated March 27, 2002, the Stipulation, having been the joint effort of counsel for plaintiffs and defendants, was implemented to achieve its goals, not to restrict it to its exact terms.

The overall goal of the Stipulation was to create and maintain a safer CPSU by reducing injurious uses force through clear policies, effective training and supervision, and timely imposition of appropriate disciplinary sanctions. The Stipulation comprises 104 paragraphs covering most aspects of the operation of the CPSU, as well as investigations into uses of force and discipline of staff found guilty of misconduct. Not only have defendants fully implemented the provisions of the Stipulation, but DOC personnel, on their own and in conjunction with the expert consultants, have implemented policies and management structures that have furthered the goals of the Stipulation even though not spe-

cifically required by its terms. Likewise, the IG has played an oversight role beyond that specified in the Stipulation, consistent with his responsibilities under the City Charter. In short, the success in the operation of the CPSU is not merely a function of specific provisions of the Stipulation, but is more fundamentally a function of the commitment of DOC personnel and the IG, assisted by the experts, to undertake the difficult work of institutional reform. In one sense, the specific provisions of the Stipulation, as well as key DOC initiatives that have contributed to the goals of the Stipulation, discussed below, tell an important part—but only a part—of the success story of the CPSU.

(a) The Expert Consultants

A key provision of the Stipulation required that the parties retain two expert consultants ("joint expert consultants" or "experts"), Steve J. Martin and Norman Carlson, to "assist them and the Court in the implementation of this Stipulation and Order." Stipulation ¶ 88. Among other things, the experts were to "assess the adequacy of defendants' use of force policy, staffing and supervision practices, training programs and any other practices addressed by this Stipulation and Order ... make such recommendations to the parties as may be appropriate to insure compliance with this Stipulation and Order; ... [and] submit written reports to the Court and the parties assessing compliance and whether compliance has been maintained for a substantial period of time." Stipulation ¶¶ 91–92

Mr. Carlson and Mr. Martin are both correction professionals with the highest credentials. Mr. Carlson was the Director of the Federal Bureau of Prisons for some 17 years and Mr. Martin has extensive experience in the Texas Department of Corrections. Both men have had experience as court-appointed monitors in systemic prison reform cases.

The provisions of the Stipulation were structured such that the role of the experts as consultants to the Department was as important as their role as monitors of compliance. In this way, both DOC and the consultants were able to assess what policies and procedures furthered the goals of the Stipulation, not merely what was required by each paragraph.

(Defendants' Response to the Court's December 2001 Order dated March 27, 2002, at 1–2.)

*The Stipulation Provisions and Compliance Initiatives*

During the first year of the Stipulation, and after extensive discussions with the experts, defendants promulgated a new use of force policy, Directive 5006, consistent with the requirements of the Stipulation. (Stipulation ¶¶ 1–2.) Defendants also revised their training curriculum, again after discussions with the consultants, to make it consistent with the new use of force policy and the requirements of the Stipulation. (*Id.* ¶¶ 1–2, 28.) Defendants also promulgated a number of other documents required by the Stipulation, with input from the experts, including:

- A new CPSU Operating Manual (Stipulation ¶ 3)

- A protocol for evaluating inmates' mental fitness for housing in CPSU and identifying alternative housing where necessary (*Id.* at ¶¶ 4–5)

- An institutional order requiring medical screening of inmates prior to the use of chemical agents. (*Id.* at ¶ 6)

- A revised institutional order setting forth the requirements for the use of

hand-held video cameras. (*Id.* at ¶¶ 86–87)

Defendants implemented a detailed screening procedure for new CPSU staff, including independent approval of proposed staff by the Inspector General ("IG") (Stipulation ¶¶ 7–15) and implemented procedures to review staff performance in the CPSU (Stipulation ¶¶ 22–24). Detailed protocols were established for the preparation of use of force reports and use of force packages. (Stipulation ¶¶ 30–37.)

In addition to the training mandated by the Stipulation, the facility has been conducting on-site training since December 1999. These training sessions emphasize the adherence to DOC policies and procedures, including the importance of using interpersonal skills, whenever possible, to avoid the use of force.

In their First Report dated February 4, 1999, ("Report 1") the experts acknowledged defendants' progress in implementing the requirements of the Stipulation but made a number of operational recommendations which they believed would reduce force in the CPSU. (Report 1 at 26–28.) The experts specifically recommended that DOC:

- Adopt a unit management model, establishing the CPSU as a semi-autonomous command with the Deputy Warden as the unit manager, reporting directly to the facility warden. (Report 1 at 27.) DOC implemented this recommendation in June 1999.

- Move the offices of the Deputy Warden for CPSU out of the administrative wing of the facility and into the CPSU itself to provide a constant management presence. (Report 1 at 27.) DOC implemented this recommendation in June 1999.

- Assign a dedicated correction counselor to CPSU to assist inmates in re-

solving social service issues such as child custody, employment, personal property and telephone calls. (Report 1 at 27.) DOC implemented this recommendation in June 1999. More recently, the warden of OBCC assigned a uniformed staff member, as well, to conduct daily rounds in CPSU to facilitate service delivery. (*See* Report 5 at 2.)

- Assign additional tour commanders to the CPSU so that there would be a dedicated tour commander in CPSU 24 hours a day, seven days a week. DOC implemented this recommendation in June 1999.

The experts also recommended for inclusion in the draft operating manual received by them on December 3, 1998, a progressive incentive privilege program and a housing stratification program. (Transcript of Hearing dated March 9, 1999 ("Tr.") at 6–9.).

In June 1999, DOC implemented an incentive system for CPSU inmates called the progressive inmate disciplinary system ("PIDS"). The PIDS program is designed to encourage and reward positive inmate behavior. A PIDS officer identifies eligible inmates—those who have shown a positive progressive behavior pattern—on a daily basis. Inmates who qualify for PIDS are housed in a separate wing of the CPSU where they have the opportunity to earn progressive privileges such as additional commissary items, telephone calls, the use of a radio and, for those who have progressed through the various levels of the program, the possibility of conditional release from CPSU. The PIDS program has been exceptionally successful and consistently praised by the experts. (Report 5 at 2–3.) The frequency of use of force in the PIDS unit is extremely low.

An active cell study program has also been initiated at the CPSU. New admis-

sions to CPSU are encouraged to take advantage of the cell study adult education program offered in conjunction with Horizon Academy. Inmates communicate directly with the director of Horizon Academy by telephone.

The most problematic and assaultive inmates have been relocated to the 3 South housing area. By limiting the number of inmates in this area to 20 or 25, staff are able to manage this population on a one-on-one basis. Certain inmates in this housing area, who have exhibited particularly assaultive behavior, are videotaped by hand-held camera whenever they are moved.

In response to repeated uses of force during escorts of inmates to various services, the escort procedure was revised to require two officers to escort known problematic inmates. In response to several incidents where inmates who refused to walk were dragged, a procedure was implemented requiring the use of a Gurney when inmates refuse to walk. In an attempt to reduce the introduction of contraband into the facility by non-CPSU sentenced inmates who work in the Unit, all such inmate workers in the CPSU are now housed in CPSU. (Report 5 at 3.)

In the first months after the Stipulation was so-ordered, a number of uses of force occurred when inmates refused to close their food slots and were extracted from their cells. This problem was addressed in several ways. To the extent that failure to close a food slot may have been an attempt by inmates to get attention for some real or perceived problem, the importance of service delivery and interpersonal skills was emphasized with staff. In addition, a dedicated correction counselor was assigned to CPSU to address inmates' social service issues. Those inmates who continued to refuse to close their food slots were placed in cells equipped with specially designed food boxes that minimize contact between staff and inmates. In their Second Report, dated September 28, 1999 ("Report 2"), the experts reported that uses of force due to food slot incidents had been all but eliminated. (Report 2 at 37.)

As the experts have noted, now when violations of policy and procedure occur, the facility administration has been quick to respond. (Report 5 at 4.) In response to an inmate suicide in January, 2002—the first during the life of the Stipulation—disciplinary action was immediately taken as soon as it was learned that existing procedures were violated, even though the inmate apparently had no mental health history indicating that he was a suicide risk. (*Id.*) In addition, the procedures were changed to require that tour commanders make two tours daily of all housing areas.

These examples by DOC administrators demonstrate the defendants' commitment to furthering the goals of the Stipulation and to ensuring, through intensive supervision and training, that these policies and procedures are implemented.

The Inspector General ("IG") for DOC has two responsibilities under the provisions of the Stipulation; (1) he is to review the list of candidates for assignment to CPSU and recommend or comment on their fitness for the assignment (¶ 14); and (2) he is to review all negotiated pleas on CPSU disciplinary charges. (¶ 73)

Wholly apart from any obligation imposed by the Stipulation, the IG has undertaken to provide independent oversight of the CPSU, consistent with his authority under the New York City Charter. *See* New York City Charter, Ch. 34, § 805. His personnel conduct tours of the CPSU twice daily, review all use of force investigations, and identify institutional and disciplinary issues that need

attention. (Report 5 at 3, 9.) The experts have recommended that the IG assess whether staff interviews, in connection with the investigation of use of force incidents, are necessary and have been conducted and whether the staff reports are complete and accurate. (Report 5 at 9.) The IG has agreed to perform these additional tasks and has been given the budget staff lines to assure that he will be able to do so as part of his general oversight responsibilities.

DOC use of force investigations in CPSU had already been transferred from the facility to a special group of dedicated investigators, the CPSU use of force unit ("CPSU–UFU") under the supervision of the Deputy Director of Investigation ("DDI") by the time of the Stipulation. The Stipulation provided for the continuation of the CPSU–UFU and set forth additional requirements for the conduct of investigations. (Stipulation ¶¶ 46–50, 58–66.)

The Stipulation required that DOC maintain the wall mounted cameras and specified additional locations to be covered. (Stipulation ¶¶ 74–77.)[3] Monitors in the offices of the Warden and the Integrity Control Officer ("ICO") permit continuous live viewing of the video cameras' output. The Stipulation also sets forth a protocol for the review and preservation of tapes recording any use of force. (Stipulation ¶¶ 80–82.)

The Stipulation also calls for the use of hand held video cameras to "record all encounters held between CPSU inmates and uniformed staff in which the use of force is reasonably anticipated . . ." (Stipulation ¶ 85) DOC must maintain sufficient hand held cameras and train officers in their use. (Stipulation ¶¶ 83–85.)

The cameras have shown themselves to benefit staff and inmates alike. All use of force investigations must include a detailed analysis of any video recordings of the incident. Facility management have extended the use of the hand held cameras beyond the requirements of the Stipulation to include coverage of all movement for the CPSU's most problematic inmates.

CPSU–UFU was initially mired in a backlog of old cases and the Stipulation required that investigation be completed within 60 days. DOC moved promptly to comply with its obligation to reduce the backlog of old cases and has reduced the length of time to disposition of all disciplinary charges against its personnel satisfactorily.

- In 1997, before the Stipulation, 218 cases were investigated and the average time to case closure was 252 days.
- In 1998, 479 cases were investigated and the average time to case closure was 62 days.
- In 1999, 623 cases were investigated and the average time to case closure was 34 days.
- In 2000, 518 cases were investigated and the average time to case closure was 38 days.
- In 2001, 527 cases were investigated and the average time to case closure was 32 days.

The experts' Reports noted that CPSU–UFU has significantly improved the quality and timeliness of its investigations and has "generally established a record of substantiating the actual application of impermissible force when the evidence is there to do so." (Report 3 at 19.) The final

---

**3.** As noted above, when the CPSU was moved from the old James A Thomas Center ("JATC") to the more modern Otis Bantum Correctional Center in March 1996, DOC installed wall mounted time-lapse video cameras to provide round-the-clock camera coverage throughout the CPSU.

Report notes that this "established record, when coupled with the clear pattern over the life of the Stipulation of less serious violations, represents a significant diminishing of serious injury laden incidents of force". (Id.) Some concern over the quality of staff reports of uses of force has been expressed by the experts, as well as the need for broader staff interviews. However, they have also indicated that they are confident that the IG and his staff can provide adequate oversight to address those concerns. (Report 5 at 9.) As noted above, the IG is already authorized by the City Charter to perform this kind of oversight, and has received additional staff to do so.

At the beginning of the Stipulation, the DOC Trials Division, responsible for prosecuting staff misconduct cases after CPSU–UFU determines that misconduct should be charged, was confronting a chronic backlog of cases, many which had been pending for years. The Stipulation imposed time frames for cases once they reached the Trials Division, and mandated that DOC, in consultation with the experts, develop penalty guidelines for force-related misconduct. (Stipulation ¶¶ 71–72.) In addition, it provides for review of all negotiated pleas by the IG. (Stipulation ¶ 73.) At the inception of the Stipulation, the average case took over 14 months to close. In February 2000 there were over 100 pending CPSU cases, 80 of them more than a year old. By October 2000, there were 55 pending CPSU cases. As of the writing of the experts final Report in January 2002, the backlog had been eliminated; there were eight outstanding CPSU cases with only one case pending for more than a year. (Report 5 at 8.) The average time to close a case is now under three months.

After extensive discussion with the experts, defendants promulgated the first draft of the Penalty Guidelines applicable to DOC personnel in December 1999. After these guidelines had been in use, the experts requested certain revisions and a second draft was promulgated and distributed to the Trials attorneys. The final version, incorporating additional recommendations of the experts, was promulgated in January 2002. (Report 5 at 8.) Well before the promulgation of that version, DOC had established a record of imposing tough disciplinary sanctions. Misconduct that in the early days of the Stipulation would have resulted in the loss of vacation days, now often results in suspensions. (Report 5 at 8.) Recommendations of the IG for stiffer penalties in individual cases reviewed by that Office have been accepted. In one case, the Commissioner took the extraordinary step of rejecting the penalty recommendation of the administrative law judge for a 30–day suspension and instead imposed a 60–day suspension. (Id.)

The experts expressed confidence that: "[w]ith the reduction in the huge backlog of cases, a mounting record of imposing more meaningful sanctions and the promulgation of an adequate set of penalty guidelines, there is now a reasonable expectancy that violations, once established by the Investigations Division will result in timely and appropriate employee sanctions." (Report 5 at 8–9.)

Three major concerns raised at the May 7, 2002 hearing were satisfactorily resolved:

1. The annual introduction of new staff into the CPSU was accompanied by spikes in use of force and serious injuries. At the conference, the City reported it was aware of the problem and reported satisfactory additional steps taken to prevent a recurrence;

2. The long delay, until January 2002 in the adoption of the final version of the penalty guidelines for violations of the

rules governing use of force was troubling; however, interim versions of the penalty guidelines had been satisfactorily utilized;

3. The quality of the use of force investigations has been a continuing source of concern. At the May 7, 2002 conference, however, the Inspector General, Michael Caruso, who is outside the Department of Correction chain of command and is employed by the City Department of Investigation, reported that the City has given him the authority and awarded him additional resources so that the CPSU group in his agency will become directly involved in improving the quality of these investigations from the time of the incident through the time the discipline is imposed.

### The Goals of the Stipulation Have Been Met

In their Fifth and final Report the experts emphasize defendants' sustained progress in implementing the terms of the Stipulation: "the last two reports reflected that facility management had made substantial progress in institutionalizing these important remedial measures." (emphasis added)(Report 5 at 1.) They note that the positive trends of reduced incidents involving serious injury and head strikes, reduced acts of self mutilation together with unprecedented levels of command discipline and the institution of procedures to safely and effectively manage the inmate population have continued and "have now been in place for a substantial period of time." (Report 5 at 2.)

Uses of force have generally declined in the unit and, most importantly, the numbers of Category "A" uses of force representing the more serious type have become consistently low. In 1997, there were 252 cases of force reported in the CPSU, of which 177 were classified as Category A,

and 75 were classified as Category B. In 1998, there were 458 reported uses of force, 103 of which were classified as Category A and 355 of which were classified as Category B. In 1999, a total of 618 uses of force were reported, 16 of which were Category A. In 2000 the number declined to 518, six of which were Category A. In 2001, 15 of the total of 529 reported incidents were Category A uses of force. The monthly average of uses of force for the last quarter of 2001 was 36, and for the period from December 23, 2001 to January 25, 2002, the average was 28. (Report 5 at 2.) The experts note that the 30 day period from December 23, 2001 to January 25, 2002 the average was 28, the lowest since monitoring began in July 1998. (Report 5 at 2.)

In addition, incidents of inmate self mutilation have declined. In calendar year 2000, there were 247 cases of self inflicted wounds and in 2001 that number declined to 139. Moreover, inmate grievances have also declined. In 2000, 220 inmate grievances were filed and in 2001 the number declined to 108.

The inmates of the CPSU have also benefitted. Not only are they the objects of fewer acts of force, they now have the benefits of greater access to medical and mental health care professionals and a full-time counselor. Furthermore, they can utilize the progressive incentive program to get rewards, including possible transfer to general population, for good behavior. The population of the CPSU has also been reduced to far fewer inmates, partly through use of the housing stratification program.

Most importantly, for continued funding considerations, the City has benefitted financially. Fewer injurious uses of force have translated into fewer officers taking sick days, which means attendant overtime costs and fewer workmen's compensation

claims. On June 12, 2002, the City provided the Court with estimates of cost savings to the DOC as a result of the implementation of the provisions of the Stipulation, stating:

> In calendar year 1997 (before the Stipulation was signed) the annualized Line Of Duty Injury ("LODI") sick rate was 6.21 days. Be calendar year 2001, the annualized LODI sick rate was virtually cut in half to 3.26 days. Because of the way attendance is tracked and the fact that certain staff work both in the main building and in the CPSU, this number represents the LODI sick rate for all of OBCC, the facility where the CPSU is housed. The estimated savings simply for calendar year 2001 as compared to the base year of 1997 is $878,162. The estimated cumulative savings for the calendar years 1998 through 2001 is $2,753,560. The Workers compensation claims, calculated for CPSU only, were reduced from 341 in calendar year 1998 to 129 in calendar year 2001. Fewer injurious uses of force also yield a cost saving in fewer hospital runs. In calendar year 1997 there were 136 hospital runs from CPSU. In calendar year 2001 the number of hospital runs was 26. The estimated cost savings for calendar year 2001 as compared to the base year 1997 is $74,076. The estimated cumulative savings for the years 1998 through 2001 is $258,493.

(Defendants' Letter dated June 12, 2002, at 1–2.)

As the City reported by its letter dated March 27, 2002:

> As noted by the expert consultants, over the course of the settlement period, the CPSU has achieved an extraordinary level of professionalism and order. The reduction in the need for force—and the resulting diminution in both the frequency and the severity of force used—is now a matter of record. With the use of inmate incentives, and the segregation of the most troubled CPSU inmates to their own unit within the CPSU, the inmate population is far more manageable than at any other time in the history of the CPSU.
>
> \* \* \* \* \* \*
>
> A safer CPSU has greatly boosted staff morale. Because the CPSU now represents the highest levels of professionalism, and because DOC has recognized excellent performance in the CPSU by promoting CPSU line and supervisory staff, there has been a tremendous improvement in staff morale in the Unit. Rather than requesting transfers out of the Unit at the earliest opportunity, DOC staff now request steady tours in the Unit—an unprecedented development. As a result of the desirability of this assignment, it is easier for DOC to recruit and retain the best qualified staff for the Unit.

(Defendants' Response to the Court's December 2001 Order dated March 27, 2002, at 13–14.)

In addition to the two expert consultants, Messrs. Carlson and Martin, whose expertise, as reported earlier, was crucial to the success of this consent decree,[4] much of the credit must go to the attorneys for the parties involved. Their combined actions showed not only attention to detail in crafting the Stipulation, but also diligence in overseeing its implementation in the highest tradition of the

---

**4.** It would be remiss of the Court not to mention that Messrs. Carlson and Martin stated that the source of many of the techniques they introduced to the CPSU were those of my friend, the late Austin H. MacCormick, Commissioner of Corrections under Mayor LaGuardia, who remained active in corrections administration until his death.

legal profession. Plaintiffs were represented by Jonathan Chasan, Sarah Kerr, and Dale Wilkerson, staff counsel of the Legal Aid Society's Prisoners' Rights Project. Defendants were represented by Assistant Corporation Counsel Martha Calhoun and Jonathan Pines in the Office of Michael D. Hess, then Corporation Counsel of the City of New York. Former Corporation Counsel Paul A. Crotty and Michael D. Hess oversaw the settlement negotiations and involved themselves at several critical junctures in the course of negotiations. DOC in-house counsel were also very much involved in the negotiation process, specifically Elizabeth Loconsolo, DOC General Counsel, and George Axelrod, then DOC Special Counsel.

Credit must also go to then Department of Correction Commissioner, Bernard B. Kerik, and to Mayor Rudolf Giuliani for voluntarily agreeing to this invasion into their executive domain. Commissioner Kerik and present Commissioner, William J. Fraser, have been equally active in implementing the changes recommended by the expert consultants.

In addition to all of the individuals cited above, the following individuals deserve tremendous credit for the successful implementation of the *Sheppard* settlement: Chief Leroy Grant (who was also Deputy Warden of the CPSU and Warden of OBCC); Warden James Barry, who was Deputy Warden and CPSU Unit Manager; Deputy Warden Michelle Mack, the current CPSU Unit Manager; Warden Mark Farsi, the current Warden of OBCC; DOC Deputy Commissioner for Trials and Investigations, Elmer Toro; DOC Deputy Directors of Investigation, Andrew Kaufman and Adrian Lauriello; Integrity Control Officer, Dennis Wall; Deputy Warden, George Okata, who oversaw the Trials Division, and from the Department of Investigation, Inspector General for DOC, Michael Caruso.

It is evident that the goals of the Stipulation have been accomplished and institutionalized and that there is no "current and ongoing violation of the plaintiff class' constitutional rights." Moreover, the control mechanisms, including departmental and independent oversight, are in place to ensure continued safe operation of the CPSU.

Since this opinion is being issued for whatever use it may have to others in the future, the Court notes that institutional change is not an easy task. Indeed, one of the experts stated after a recent conference that the progress in the transformation of CPSU has been much faster that he would ever have guessed. In this case, it took almost four years before all the pieces of the institutional reform were in place, and until there was some assurance that there would not be backsliding into past habits and mind sets. Now that the benefits of the institutional reform for all parties are apparent, it is hoped that what was learned will be expanded within DOC and that other institutions will adopt similar policies with similar results.

The reason for the invocation of this Court's equitable powers no longer existing, the Stipulation is terminated and this case is dismissed with a salute of gratitude to all those whose dedicated efforts contributed so much to its successful outcome.

IT IS SO ORDERED.